May it please the court, my name is Paul Friedman. I'll be arguing the appeal on behalf of the appellants. I will reserve three minutes of my time for rebuttal. Your Honor, this case involves the failure of the appellees to provide proper notice to employees, the union and government employees, as mandated by the WARN Act. WARN Act, Your Honor, is a very social legislation which requires that covered employees give 60 days written notice to employees, the union and government officials, who will be adversely impacted by a pending shutdown. The statute is remedial in nature, and while it contains limited exceptions to the 60 day notice, and permits some reduced notice, those exceptions are to be narrowly construed. Counsel, you'd help us out if you would begin with a statement, I intend in this oral argument to address the following issues. Yes, sir. I intend in this oral argument to address the issue of the single employer doctrine, and the issue as to the faltering company doctrine, as well as the standing of the ERISA funds. Could you, do you think you could begin with that? Thank you. Excuse me, sir. Could you do it in reverse order? Perhaps do the found that the ERISA funds lack standing under the WARN Act. It was never asserted that the ERISA funds had standing under the WARN Act. It was asserted that the ERISA funds had standing under ERISA, and the reason that they're important in this case is because the benefits that were earned or would be earned by the union employees are benefits which have to be paid to a multi-employer benefit fund, whether it be a welfare fund or a pension fund. ERISA recognizes that neither the employees nor the union have any right to those assets. Doesn't the WARN Act explicitly state who can sue under the provisions of the Act? The WARN Act states who could sue under the WARN Act. The ERISA funds sued under ERISA. Well, wait a second. Isn't this an exclusive list of who can file a claim under the WARN Act? It is an exclusive list of who can file a claim under the WARN Act. Let's take the language of the Act itself. The Act states that a person seeking to enforce liability, including a representative of employees or a unit of local government, aggrieved may sue. Correct. Do you agree with that language? Now, how do the plaintiff funds or benefit funds qualify as a person or a representative of employees or a unit of local government? They're not suing under the WARN Act. They're suing under ERISA for the benefits that are owed under the WARN Act. Let me explain the difference. You have the non-union employees. But you agreed with me before that this sets forth an exclusive list of who can sue under the WARN Act for benefits under the WARN Act. No, no, no. That's where you disagree with me. Well, now, this is where you have to look at the provision of the WARN Act. Let me understand what you are saying. You concede that this is an issue under the WARN Act, right? I'm conceding that the issue as to the employees and the union is an issue under the WARN Act. The issue as to the benefits for the non-union employees is an issue under the WARN Act. The issue as to benefits as to the unionized employees is an issue under ERISA. Well, I understand your position on that. As far as I'm concerned, it might be helpful to get to another issue. You only have 15 minutes. Yes, sir. That's my own feeling. Okay. I have no other questions on the standing issue. Excuse me? I have no other questions on the standing issue. They are, they, the appellees, failed to provide the 60-day notice. They sought to use an exception, a defense, the fault of a company. It is our position that there were material issues of fact regarding essential elements which the district court either misinterpreted or simply ignored in its granting of summary judgment. For example, the first issue which we've reserved on appeal is whether truck leasing and transport were a single employer. If this court were to find that they were a single employer, there is no issue as to the fact that they would not be a faultery company because they had sufficient assets to last during the warrant period as reflected by the $10 to $15 million injection of money into APA transport by APA leasing within six weeks after the shutdown. What if we disagree with you on the single employer theory? All right, if we disagree as to the single employer theory, your honor, then we go to the issue as to whether or not they, APA, complied with the fault during company analysis. Now, the district court found that a crucial factor in this, its determination, was whether or not there was a condition precedent imposed by Transamerica on APA transport. It said that the condition precedent was the requirement that the owners of the company put in additional capital personally. The district court, in finding that that was not a requirement, that it was an issue, but it was not a requirement, That was when, Mr. Friedman, was that at the October meeting? Well, it starts at the October meeting, yes. At the October 24th meeting, you have the testimony by Mr. Fisher, who is the no money going into the company by either of the principles, there'll be no further money coming from Transamerica. Well, that was the position at the time. Didn't later the vice president say, look, we had our options open? No. The vice president, which is Mr. Norito, who is three levels down from Mr. Fisher, and if you go to page 29 of the court's decision, this is interesting. So, as long as Armand, Mr. Paulin, an owner, and or Arthur Imperator, and or the affiliates wanted to, or would continue to put in money, we weren't going to pull the plug. Now, the court says Fisher did. What page of the court's opinion? Page 29. Thank you, sir. It's after the court bolds the bottom page 28. It then goes to the quote. Now, Mr. Norito's quote reflects exactly what Mr. Fisher said in October of 01. The district court disregarded Mr. Fisher. There's no mention of Mr. Fisher. And yet we go to Mr. Norito, who the district court relies upon as being the final word, and there it is. So, as long as Paulin and Imperator and the affiliates wanted to, or could continue to put in money, that's exactly what the requirement was. The district court also noted that APA Transport had offered two mortgages in exchange, of course, for continued funding. Why doesn't that satisfy the actively seeking financing requirement? Because the district court erred as to when those monies were pledged. You mean the mortgages? The mortgages were pledged. Those weren't pledged. That was after the lender in November had said, you're in default. That was after the APA said, we couldn't even give them financials. And the problem, of course, the problem, Mr. Friedman, is Transamerica had said that several times before and had just automatically renewed or renegotiated the outstanding debt. Hadn't renegotiated, had waived covenants. The difference is the end of the loan is February 28, 02. It was a six-year loan. They had found steps to keep, and it's not unusual, to keep the lender out of default. But there was no extra money put in at any time except in May of 01 when the APA was up against the loan amount with the requirement that they bring in more security, $17 million of security. They said, you'll get another $4 million, but you have to use the $4 million for no purpose other than to pay us back to come down below the loan limit. Counsel, on page eight of your reply brief, you state at the end of the paragraph at the top of the page, had the appellees actively been seeking capital during the 60-day period, they would have been able to demonstrate concrete attempts to secure the additional security or financing in timely fashion. Now, I go to the appendix, pages 1040 and 1042. We've got two letters here in January. I mean, I'll read from the one on 1042. I'm renewing, this is from Armand I'm renewing my request that Transamerica provide us with an additional loan. How's that not a concrete attempt to secure additional funding? What that was, that was window dressing. Because Mr. Pohan, if you look at the transcript here at the appendix, Mr. Pohan had said, since October of 01, the family was exiting the business. Mr. Pohan made no indicia of getting additional financing. One of the issues was, Mr. Imperator, Mr. Imperator's testimony, which also appears in the appendix, I think at page 549, indicates I was never asked for more money in that window period. So how could you be seeking, actively seeking financing if the most logical source wasn't even asked for the money? The two mortgage offer in January doesn't qualify? Doesn't qualify, because remember, your honor, two mortgage offers doesn't mean a thing because of the fact, based upon the previous experience, it took four months to get the property appraised, it did four months to get the remediation, and they knew it because they'd done it back in 01. So the fact that you at the last minute say, I'll pledge property, I could pledge property, what's the difference? Nothing was done. Your time is up. Thank you, Mr. Friedman. Mr. McMurdy. Your honors, counsel, I believe you had requested that the issues be addressed in three specific phases. If Mr. Friedman was able to get to the standing issue of the falter in company exception, I will address them in that same order then for your honors. Specifically with respect to the Pelley's perspective, we disagree with the assertion that these are two separate causes of action. This is a cause of action brought under Warren, and Warren specifically provides what the damages are that are available to an aggrieved person under the act. And included in that relief under the statute is, of course, wages, and then it's benefits. And the benefits is not the contribution to the benefit fund or the contribution to the pension fund, but it is the value of the benefit that the participant would have received had the 60-day notice period not been violated. It is a valuation issue. It is not a, quote, contribution issue. So to the extent that any of these aggrieved employees, and Judge Alderson, you are correct, the statute is very specific about who it defines may bring the causes of action. An aggrieved employee may recover the value of the benefits, but in many instances, the courts have held that those value of those benefits are, for example, the payment of medical expenses that weren't covered by the benefit plan. So the benefit plan, in your argument, doesn't have a dog in this fight. It is exactly the correct position, your honor, and well stated. From that perspective, I think we would then go forward with the falter in company exception, and look specifically at this idea that if APA transport does, of course, qualify under the faltering company exception, the other points are mooted out. So certainly the standing issue for the benefit funds is tied into whether or not APA transport receives the benefit of the faltering company exception. And as stated in our brief, the faltering company exception has four specific criteria, the actively seeking financing, realistic opportunity to receive that financing that will be sufficient if obtained to help the company survive, and that the employer reasonably believed that notice, the 60 day warrant notice, would adversely impact their ability to receive the financing. Counsel, why didn't your client seek an extension of the loan? Wouldn't that have been the easiest thing? Is there anything in the record that addresses that? In fact, in the October 2001 meeting, and the discussions throughout, I believe the record indicates that they were all available options to the company, not only additional financing under the revolver, but also for an extension of the call date. And you'll note that from the record, the February 23rd letter, sorry, the February 13th, 2002 letter from Transamerica does not say no additional financing will be granted. It says no extension on the loan will be granted. Well, then wasn't there a pretty specific procedure to extend that loan? It had to be in writing within a certain amount of time, and it was not done, I don't think. Well, and Your Honor, part of that discussion in the October, and throughout the curing of the defaults and things of that nature, the primary concern with respect to continuing the loan, and as testified by the Representative of Transamerica, is that the process had been effectively shunted by the fact that APA Transport could not bring its financing up to speed to be able to get its audited financial statements. Consequently, in each year, each November of each passing year, Transamerica gave them a waiver. You know, but I'm still at a loss, Judge Chigares' question is what specific steps did you take? The conference report that you may be familiar with concerning this legislation states specifically that to avail yourself of the faltering company defense, an employer must prove the specific steps it had taken at or shortly before the time notice would have been required to obtain a loan, to issue bonds, or stock, etc. What specific steps did you take? Your Honor, in October of 2001, the Principal and the Chief Financial Officer of APA Transport met with the two Representatives from Transamerica at the Transamerica office. I note right away, you didn't request that meeting. That meeting was requested by APA, right? Yes, APA Transport requested that meeting. Or was it Transamerica? APA had requested two meetings prior to that. I believe that date was agreed to by the parties, but it had been a requested meeting by Mr. Pota. I thought that was requested by Transamerica. That was my impression as well. Yeah. I mean, they were concerned about the status of their loans. They requested a meeting. I asked a question. What specific steps did you take to secure financing? I believe the record testimony of Mr. Astle and Mr. Dorito. Mr. Dorito, the Representative for Transamerica, and the testimony of Mr. Astle, who was the CFO of APA Transport. Both of them testified that prior to this October meeting, they had been in regular communication back and forth with respect to financing, primarily telephone conferences. That or before the 60-day period is a critical period. Before October of 2001, Transamerica calls the meeting in October of 2001. They go and they meet with Transamerica. Transamerica, both Steve Fisher and Christopher Dorito, both Transamerica Representatives testified in their deposition that at that October 2001 meeting, specifically, Orman Pohan requested additional financing. So in October of 2001, they met with Transamerica and they requested additional financing. And as Mr. Friedman points out, Mr. Dorito said his impression was that he had said that no additional financing would be coming unless. And so therefore, he sets forth a criteria that says we're not not considering additional financing. We are saying we are going to put conditions on additional financing. Was APA also told that all options are open? And that is what Mr. Dorito had said was in his testimony. At that stage, all options were on the table. We were not calling the note, even though they were in default, they were not calling the note. The option would have included calling the note. Calling the note or denying the request for financing. Nothing would have precluded Transamerica from saying right there in October of 2001, no more money. But they didn't do that. And in fact, there is no rejection from Transamerica until the February 13th, 2002 letter. So consequences. Counsel, this is Judge Aldous, sir. What is the standard of review on this issue? Is there any factual component to the standard of review? Your Honor, it is a de novo standard of review, so there is a factual component. There is a factual component? Yes, Your Honor. Do we look at that factual component on the clearly erroneous measure? No, Your Honor, I believe it is a straight view. Okay. All right. And, you know, the standard of review, though, is the same that Judge Brown applied in determining the motion for summary judgment. And that is you look at whether or not the totality of the events lead to the determination that they were actively seeking financing. Sorry. Yeah, it's a very narrow defense. I think you'll agree. So I'm still looking for the steps that were taken to actively seek financing. They met in October of 2001. As Mr. Fisher testified, unless there is additional financing coming from the company, I need more money in here. The parties in November, APA Transport is in default. In December, Transamerica waives that condition and takes them back out of default. In January, APA Transport pledges two additional properties for additional financing. In February, APA Transport, sorry, Transamerica says it's not enough. So up until February 13th of 2002, you have that chain of events. The first is we had the meeting where we discussed additional financing. Then we went into default, and Transamerica excused the default. And then in January, we pledged the properties. So it's a situation where beginning in October of 2001, well in advance of the 60-day notice requirement, the process was commenced. Your one and only effort at seeking financing was through Transamerica. Yes, Your Honor. As testified by Mr. Garrido, at that stage, APA Transport's assets were so encumbered by the note with Transamerica that they had no other financing options available. What about those letters I referred to as your adversary, Mr. Pohan? Are they window dressing? No, Your Honor. They are the culmination of that effort to obtain that additional financing. Mr. Fisher's testimony was that unless there is additional money coming from the companies or from the owners, and to obtain that, at that stage, they had properties that were unencumbered that had that approximate value was listed in those letters. And mortgages were offered in the amount of those properties. Maybe you could recap for me. After the October, October 24, I think there was a meeting. After that meeting, what specific steps did APA take to secure financing? Take me up to the offer of the two mortgages in January, but did APA do anything in between those two dates? Well, in November, they went to Transamerica and asked them to waive the default on the note that had occurred as a result of the revolver not being at the appropriate level. So in November, they said, well, wait, we're in default again. Can we cure that default? And in December, Transamerica said that default is waived. Does that constitute fighting additional capital, though? Well, it constitutes not calling the note. So the issue had been the problem. In January 2nd, APA offered mortgages on two properties as additional collateral. Is that right? That's correct, Your Honor. Okay. While I have you, this is some of my judgment. And I asked about that statement, the status of facts. Of all the facts that you are giving us now and in your brief, what facts are controverted by your friends on the other side? Well, I think, Your Honor, it's the interpretation of the facts that are controverted. And the issue of the answer is that the facts themselves are not controverted. I don't believe the facts are controverted, Your Honor. There was a meeting in October. There was a pledge of the mortgages. There was a waiver of the default in November and December. So these events were taking place. There were clearly communications. I believe what Judge Brown said in his decision was that this was a progression from the October time period until, ultimately, Transamerica cut them off. On January 2nd, you offered mortgages. On January 24th, you again offered the mortgages. That's correct. And then it was February 13th, you got the drop deadlocked. That's correct, Your Honor. Well, the problem with the mortgages is, I mean, I'm looking at the efforts at actively seeking financing at or shortly before the time notice would have been required. And those mortgages were offered well, well into the 16-day period, weren't they? Well, well, well is a week. The issue is, Your Honor, that you're talking about a time period that is, in and of itself, you talk about that 60-day window. And I believe that the appellants specified in their brief that that 60 days would have convinced December 20th. It would have been the 60-day window. But you have, prior to that, you have the October meeting and you have the discussions. When you say actively seeking financing, that's the question. What are you actively seeking financing? You have one entity from which you can receive any financing because of business issues. So you have communications, regular communications, between the controller of APA Transport and Mr. Norito, the representative for TransAmerica, who controls the account. In fact, you got an infusion of $15 million very shortly after the default. You could seek financing from several other of your APA's enemies. Your Honor, that's an interesting proposition because what it does is it specifically calls into question facts that are not in the record. And the question is, where did the money come from and in what stage had it occurred? It's easy to look post and say, well, obviously, there was $15 million there. But we don't know when that $15 million came into existence. And I believe it says between $10 and $15 million. So the number is not even completely clarified. Not that it's part of the record, but you're saying it's not part of the record? I'm saying that there is no evidence showing how APA Truck Leasing, the entity that ultimately loaned the $10 million, at what stage APA Truck Leasing actually had the money available to lend. All right. Thank you. Let me give you, just so we can be very clear, because you talked about the October meeting and then telephone call. Give us everything you got from the meeting in October till the 60-day, according to the deposition testimony of Christopher Nerito and Fred Astle, the two principals that dealt with each other on a regular basis. There is a meeting in October, I believe it's October 24th of 2001, where they meet. Everybody agrees APA Transport is here looking for more financing. They say, our options are open. Mr. Nerito says, our options are open. Mr. Fisher says, not unless. All right. They go forward. There's testimony from Mr. Astle that says, I'm on the phone with Chris Nerito on a regular basis. Chris Nerito says, I'm on the phone with Fred Astle on a regular basis. November comes. APA is in default. Say, hey, wait a minute. You're in default. They say, can we have another extension? A waiver of that default is filed in December. So the parties agree in December, we're going to waive the default. We're still working on the capital issue. January 2nd, Raman Pohan sends a letter, says, you want more capital? We're pledging these two properties. They have approximately $4 million in value. We're putting those on the table. Again, January 24th, he says, as to those two properties, we've not heard back from you on whether or not you want to go this route to add the additional financing. Christopher Nerito testifies that on February 13th, he calls APA Transport, says, you're getting a letter that says, no, we're no more financing and we're cutting you off on the loan. Judge Brown, according to Mr. Friedman and the record, got that wrong and thought that the properties were I can't remember the date, perhaps December. Would that fact change our view of whether you were actively seeking financing? Your Honor, it does not impact Judge Brown's decision because as Judge Brown put in his decision. Well, I mean, had he known, had he thought that it was, they were offered in January rather than December? Might that not change his view of whether there was an active seeking of financing? I don't believe it would change his view, Your Honor, because ultimately what he wrote in his decision was that the totality of the chain of events that occurred between the October meeting and the ultimate determination not to provide the financing in February of 02 indicates a progressive actively seeking financing. So it was not the pledging of the mortgages that was definitive. It was not the October meeting that was definitive. It was not the waiver of the conditions in November that was definitive. It was, in his opinion, the chain of events that occurred to show from a business perspective they were actively seeking the financing from the one entity that could provide the two. All right, Mr. McMurray, thank you very much. Thank you, Your Honors. Mr. Friedman. Your Honor, one of the issues which counsel overlooked on the faltering company is the company has to be faltering. If, in fact, APA truck leasing and APA transport was deemed to be a faulty employer, they weren't faltering. So that should be clarified. As to Your Honor's questioning, and it's very interesting, shortly before December 20th, what did they do? And the answer is they did absolutely nothing. They were invited to a meeting or ordered to a meeting in October to determine whether or not, because the loan is in question. They asked for money. That's what they did. Mr. McMurray refers to their actions in November. That was to cure a default so the loan wouldn't be called. That's not actively seeking financing. That's keeping the loan facility open until the end of the loan period. If they wanted to extend the loan period, there was a provision, as Judge Chigares pointed out, they had to start the process in late December of that year. They never did. Moreover, Your Honor, if, as Judge Brown determined incorrectly, that there was a pledge of $3 to $4 million in the appropriate period of time, then the judge might have determined that that was actively seeking financing. But as recognized by counsel, that didn't occur until January. So if you're going to look at the totality of the circumstances, it's the totality of what Judge Brown thought was going on. A large factor that $3 to $4 million was not pledged in that crucial window period. And the crucial window period is required by the statute because the framers of the statute determined it to be important. So, Your Honor, in response to your question, nothing was done. Any further questions, Your Honor? Mr. Friedman, thank you. Judge Aldister, any questions? None, Your Honor. Thank you, sir. Thank you, Mr. Friedman. Thank you, both sides, for well-presented arguments. Court will take the case under advisement.